**No. 57608.**—B. Spiliadis & Company *v.* United States, protest 177682–K (New York).

OLIVER, Chief Judge: The merchandise in this case was invoiced as "500 bundles each 2 boxes Smoked herring." It was assessed with duty at the rate of 1 cent per pound under paragraph 720 (a) (2) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, as soft-cured, whole-smoked herring. Plaintiff claims that the merchandise is properly dutiable under the same paragraph, as modified by the said trade agreement, at only ½ cent per pound under the provision therein for "hard dry-smoked herring."

The pertinent provisions of paragraph 720 (a) (2) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, *supra*, read as follows:

Fish, smoked or kippered (except fish packed in oil or in oil and other substances and except fish packed in air-tight containers weighing with their contents not more than fifteen pounds each):

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

Herring:
   Whole or beheaded, but not further advanced:
      Hard dry-smoked_____ ½¢ per lb.
      Other_____ 1¢ per lb.

As it was stipulated in this case that the merchandise involved herein is herring, whole or beheaded, and is smoked or kippered and not packed in oil or other substance or packed in air-tight containers, the sole issue herein is whether or not this merchandise is hard dry-smoked herring.

Four fish, representative of the imported merchandise, were received in evidence as plaintiff's collective exhibit 1. Examination of these articles shows that they are dark yellow in color and firm to the touch. Another sample, introduced by the plaintiff to illustrate fish, other than hard dry-smoked herring, and which was stated to be a "mild cured" herring, was received in evidence as plaintiff's illustrative exhibit 2 (R. 9). This article is of gold color, lighter in shade and softer than plaintiff's collective exhibit 1.

The record discloses that plaintiff's collective exhibit 1 had been kept in cold storage refrigeration from October 1950, the date of importation, up until about 1 month before trial, when the fish were turned over by the plaintiff to its attorney for examination. Subsequently, after being not more than an hour out of refrigeration, these fish were returned to the court where they were placed in the deep freeze on these premises. In this connection, the importer testified that, if a cured herring is kept out of refrigeration, it becomes moldy but does not get darker in color nor does it dry out, because of the oil in the fish. He likewise stated that all herring, whether hard, soft, or mild, if kept in proper refrigeration, as was the case with the fish in plaintiff's collective exhibit 1,

does not lose but retains its moisture. In his opinion, the fish in question had not dried out but have the same percentage of moisture as at the time of importation.

Two importers who had considerable experience in the buying and selling of fish products testified on behalf of the plaintiff. The importer of the involved merchandise testified that he had handled hard dry-smoked herring for over 25 years and identified plaintiff's collective exhibit 1 as being representative of such an article, stating that they are "hard dried cured * * * herrings or bloaters." The witness described the various cures of herring as being soft, mild, and hard. The hard dry-cured gives the herring a yellow or dark-yellow, almost brownish in shade, color, while the mild-cured gives the fish a gold color, and the soft-cured is indicated by a still lighter gold color. Another characteristic difference, other than color, was stated by the witness to be that in handling. "When you handle a hard dried herring, it is harder, while the mild cure is a little softer and the soft cure still softer" (R. 6). The witness further testified that he had bought and sold merchandise similar to plaintiff's collective exhibit 1 as hard dry-smoked herring and that they are the hardest cured herring used in the United States. He stated that he had never handled a smoked herring of a darker color than these articles. On cross-examination, the witness testified that he was familar with the term "export bloaters," which he stated are very hard-cured, but that such articles are not consumed in this country.

Plaintiff's second witness testified that for over 32 years he has been engaged in the buying and selling of fishery products in Europe, Newfoundland, Canada, the Caribbean area, West Indies, and South America, during which period he had handled hard dry-smoked herring for about 25 years and the soft-cured herring for about 10 to 12 years. He corroborated the testimony of the previous witness as to the characteristic distinctions between hard dry-smoked herring and soft-cured herring, namely, moisture content and color, stating that the color of a hard dry-smoked herring was "golden amber color, golden amber or almost brown" (R. 41). He further testified that the fish in plaintiff's collective exhibit 1 were of a darker golden color than the soft-cured herring, being a firmer fish with a great deal less moisture and less perishable than the soft-cured article. The witness stated that while he had never seen the process of smoking a hard dry-smoked herring, he had seen considerable quantities of both the hard- and the soft-cured type. In his opinion, the fish in question were hard-smoked bloaters which he stated were the same as hard-smoked herring.

On cross-examination, the above witness testified that the hard-cured herring is imported into this country and can be kept in retail stores for a considerable period, whereas the soft-cured herring is cured principally in local markets and is highly perishable fish sold day by day. He described the fish in plaintiff's collective exhibit 1 as processed or hard-smoked. He further testified that he had heard of the term "export bloaters," having bought and sold them. He described such articles as being a smaller fish, very hard, and of a "very dark, very dark brown" color. In his opinion, the fish in plaintiff's collective exhibit 1 were not export bloaters, which he likewise stated were not sold for consumption in the United States but were only imported in bond for consumption in the tropics. He further testified that these fish, while not export bloaters, were, however, the hardest dry-smoked herrings he had ever seen sold in the United States (R. 57).

The defendant's first witness, the examiner of the merchandise under consideration, described the curing process as a combination operation of smoking and drying. He testified that, in his official capacity, he had examined "export bloaters" many times and stated that they are a whole-smoked herring, quite dry and stiff, and "really hard dry cured," considerably harder than the fish in plaintiff's collective exhibit 1 (R. 64). He considered an export bloater and a hard dry-smoked herring to be the same. The record indicates that this witness

accidentally broke one of the fish in plaintiff's collective exhibit 1 in handling. He testified that he would not consider the involved fish as "export bloaters" because, in his opinion, they are soft and moist and are capable of bending in one's hand, whereas an export bloater is not as pliable as the fish in plaintiff's collective exhibit 1. "The skin on a hard dry-smoked herring, because moisture has been lost, the body of the fish contracts and that makes the skin loose and the skin wrinkles on a hard dry-smoked herring. This skin is smooth" (R. 67). In his opinion, the fish in plaintiff's collective exhibit 1 were soft-cured herring, "because it is soft, the skin not dried," and he considered the export bloater to be the only herring that was hard dry-smoked. This witness stated, as opposed to the previous testimony of the plaintiff's witness, that most of the herring that is imported into the United States is of the soft-cured herring type and that the samples such as those in plaintiff's collective exhibit 1 are the type which he considers soft-cured.

On cross-examination, the above witness admitted that plaintiff's illustrative exhibit 2, which, in his opinion, was a soft-cured fish, was a fuller fish than those contained in plaintiff's collective exhibit 1, containing more moisture and having a smoother skin than the representative samples. He also agreed that these illustrative samples are darker in color than those in plaintiff's illustrative exhibit 2. "In fact, it is blackish." This testimony as to the color of the fish in the imported shipment agrees with that of the plaintiff's witness in this respect.

Defendant's second witness, a chemist in the United States Customs Laboratory, testified than an analysis of a sample herring from the involved shipment indicated that it contained 48.1 per centum moisture. In this connection, there is nothing in the record to establish whether this percentage so found is determinative of the question whether the imported fish are soft-cured or hard dry-smoked herring, and no particular percentage of moisture content was established as a norm to determine whether a fish was soft-cured or hard-cured.

The same issue as that presented herein was before the court in several previous cases. *S. A. Haram* v. *United States*, 5 Cust. Ct. 159, C. D. 390; *S. A. Haram* v. *United States*, 9 Cust. Ct. 395, Abstract 47465; *Schumacher Bros., Inc.* v. *United States*, 9 Cust. Ct. 411, Abstract 47541; *S. A. Haram* v. *United States*, 10 Cust. Ct. 412, Abstract 48071; *Atlantic & Pacific Packing Co., Inc.* v. *United States*, 12 Cust. Ct. 321, Abstract 49441. In each of the cited cases, the importer's claim for classification as "hard dry-smoked herring" was sustained.

The testimony in the case at bar as to what constitutes a hard dry-smoked herring is substantially the same as that in the cases above cited. In the previous cases, the records indicated that the distinguishing characteristics between hard dry-smoked herring and soft-cured herring were the color and hardness of the fish. The present record makes the same distinctions. The importer herein testified that the longer the fish is smoked, the more moisture is extracted from it, and the harder it becomes. He considered the presence of moisture to be the primary test as to whether a fish is hard- or soft-cured, which distinguishing feature was agreed to by the Government examiner. The latter witness testified that the "golden" color of the fish in plaintiff's collective exhibit 1 indicates that they have gone through the smoking operation a long time but stated that that fact would not necessarily mean that they have gone through a drying process (R. 69–70). He subsequently agreed, however, that color is, to a considerable extent, one of the controlling ways to determine a hard dry-smoked herring and testified that if the color of the fish is golden, indicating a lot of smoke, as in the case of the merchandise at bar, it would ordinarily be considered as having gone through a rigid drying process. Examination of the illustrative samples shows them to be of a dark-yellow color, indicating their hardness.

In the present case, it: s apparently the contention of the defendant that the "export bloater," which is described in the present record as being extremely hard, is the only hard dry-smoked herring contemplated by the concession in the trade agreement here in question. A similar argument was advanced by the Government in the first *Haram* case, *supra* (C. D. 390), as well in the second *Haram* case, Abstract 47465, and in the *Schumacher Bros.* case, *supra*. The relevant testimony in the cited cases was to the effect that to constitute a hard dry-smoked herring the article had to be almost bone dry. This court in those cases held, however, that the involved merchandise, although not bone dry or very hard, was, nevertheless, hard dry-smoked herring, as indicated by their dryness and color, and, accordingly, entitled to the reduction in duty claimed under the pertinent trade agreement.

We are of the opinion that the concession under which the plaintiff claims, reducing the rate of duty on "hard" dry-smoked herring, is not limited to export bloaters, which this record shows are not sold for consumption in the United States but are only shipped to this country for exportation to foreign markets for consumption there. It seems obvious that the concession granted under the trade agreement herein applies to commodities sold to and used in the United States. The testimony of the plaintiff's witnesses was to the effect that the involved merchandise represents the hardest dry-smoked herring consumed in this country. Their testimony in this respect was not controverted by any evidence on the part of the defendant, and no sample of a fish harder than those in plaintiff's collective exhibit 1 was offered in evidence. The term used in the trade agreement is "hard" dry-smoked herring and not "export bloaters." Although it is conceded that the fish involved in this case are not export bloaters, the defendant's own witness admitted that there is no type or class represented by any intermediate amount of moisture between the export bloaters and the involved merchandise. It would appear, therefore, that the smoking and drying processes to which the involved merchandise has been subjected support a finding that it is hard dry-smoked herring, as contemplated by the pertinent trade agreement.

Samples are potent witnesses. While the defendant's witness testified that the skin on the fish in plaintiff's collective exhibit 1 was smooth, which would make them, in his opinion, soft-cured herring, this conclusion is not supported upon an examination of the exhibits in question. It appears that the skin on these fish has contracted and is wrinkled, which defendant's witness gave as indications of a hard dry-smoked herring.

The testimony in this case is conflicting in many respects. We are of opinion, however, that the plaintiff herein has overcome the presumption of correctness attaching to the collector's classification and has established on its part that the involved merchandise is hard dry-smoked herring, as claimed.

On the record presented and following the holding of this court in the cases heretofore cited, we hold the involved merchandise to be hard dry-smoked herring and accordingly dutiable under paragraph 720 (a) (2) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade (T. D. 51802), at the rate of ½ cent per pound, as claimed.

The protest is sustained. Judgment will be rendered accordingly.